UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  13-80054-CR-MARRA

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

DONTAVIOUS BLAKE,

     Defendant.

_____/

**DEFENDANT BLAKE'S MOTION IN LIMINE REGARDING EVIDENCE
OF COERCION AND EXPERT TESTIMONY IN SUPPORT THEREOF**

    Mr. Dontavious Blake and his co-defendant, Tara Moore, are charged with causing minors (i.e., individuals incapable of legally valid consent due to their age) to engage in prostitution and with forcing non-consenting adults to engage in prostitution through coercion, all in violation of 18 U.S.C. §1591(a).  Regarding the former category of charges pertaining to minors, the Government has filed a motion *in limine* "To Bar Evidence Of Consent And To Exclude Prior Sexual History Of Victim."  PACER Doc. 64.  Regarding the latter category of charges pertaining to allegedly non-consenting adults, the Government intends to call women as witnesses who will testify that the Defendants enticed them to abscond from residential drug treatment programs, resume active drug use with drugs supplied by the Defendants and to live in housing made available by the Defendants, and to work for them as prostitutes.  Mr. Blake, through counsel, hereby moves *in limine* to limit the scope of the Government's evidence to properly qualified, relevant and non-prejudicial evidence in support of the charges that relate to alleged forcible coercion of non-consenting adults to engage in prostitution, including the preclusion of expert testimony in support of same.

1

**The Government's Theory Of Coercion Of Adults To Work For**
**The Defendants As Prostitutes Against Their Will**

Counts Four, Five and Six of the Third Superseding Indictment charge the Defendants as

follows:

Count Four:    From September 2, 2012, through September 9, 2012, they recruited,
enticed, harbored, transported, provided, obtained and maintained a
person, K.T., knowing and in reckless disregard of the fact that force,
threats of force, fraud, coercion, or any combination of such means
would be used to cause K.T. to engage in a commercial sex act, in
violation of 18 U.S.C. §1591(a)(1) and (b)(1) and 18 U.S.C. § 2.

Count Five:    From September 5, 2012, through October 4, 2012, they recruited,
enticed, harbored, transported, provided, obtained and maintained a
person, K.C., knowing and in reckless disregard of the fact that force,
threats of force, fraud, coercion, or any combination of such means
would be used to cause K.C. to engage in a commercial sex act, in
violation of 18 U.S.C. §1591(a)(1) and (b)(1) and 18 U.S.C. § 2.

Count Six:    From August 2, 2011, through October 4, 2012, they conspired with
each other and with others known and unknown, to recruit, entice,
harbor, transport, provide, obtain and maintain a person, knowing and
in reckless disregard of the fact that force, threats of force, fraud,
coercion, or any combination of such means would be used to cause
the person to engage in a commercial sex act, in violation of 18
U.S.C. §1591(a)(1) and (b)(1) and 18 U.S.C. § 2.

The Government has not filed a trial memorandum proffering its evidence in support of Counts 4,

5 and 6. Upon information and belief, based upon discovery received to date and representations

made by the Government, their theory of the case as to Counts 4, 5 and 6 is as follows. There were

certain women, such as "K.T." and "K.C." identified in counts 4 and 5, who were drug addicted

adults. They were participating in court-ordered residential drug treatment programs under the

authority of the "Hal S. Marchman Alcohol and Other Drug Services Act," Fla.Stat. §§ 397.301 et

seq. According to the Government, the Defendants enticed the women (with whom they had no prior

relationship) to abscond from the program, resume drug use and to engage in prostitution. The

Defendants, according to the Government, provided them with drugs and a place to live while they engaged in prostitution in exchange for a portion of the proceeds of their prostitution activities. The arrangement in each instance was terminable at the will of the woman. In each instance the woman terminated the arrangement, either to return to a drug program or to move out of the area, with no objection from the Defendants. As alleged in the indictment, with K.T. this arrangement lasted one week and with K.C. this arrangement lasted one month before each terminated it. The Government has declared, in response to a motion for a bill of particulars, that although Counts Four, Five and Six track the statutory language, which broadly encompasses *fraud*, force or coercion, it is not claiming *fraud* as an operable fact in this case. The Government is claiming *coercion* was used by the defendants to *force* the women in question to engage in the offense of prostitution against their will. In particular, the Government's theory of prosecution appears to be that the Defendants exploited drug addicted women by supplying them with narcotics, or facilitating their access to narcotics, to render them dependent and helpless to resist the Defendants' desire to employ them as prostitutes, due to their fear of suffering the physical and emotional pain of withdrawal from narcotics if they were financially unable to continue obtaining narcotics because they stopped working as prostitutes. The Government has declared that it will seek to call an expert witness (or witnesses) to support its theory.

On June 25, 2014, counsel for the Government wrote a letter to the undersigned counsel stating the following:

> In accordance with Federal Rule of Criminal Procedure 16, please be advised that the United States, during its case-in-chief at trial, intends to offer the testimony of Barbara A. Krantz, MD as a medical expert specializing in addiction. Please allow me this opportunity to provide you with a summary of the expert witness testimony the United States intends to offer pursuant to Rules 702,

703, and 705 of the Federal Rules of Evidence.

Dr. Barbara A. Krantz will testify as an expert in the field of medical practice and the diagnosis treatment, and consequences of drug addiction. In particular, she will explain her professional understanding of the following drugs: (a) Oxycodone; (b) Alprazolam [a/k/a Xanax]; and (c) Cocaine. Basically, Dr. Krantz will explain what each drug is used for (e.g., breakthrough pain relief, muscle relaxant, etc.), what physical and psychological effects it has on an individual, the potential for addiction or abuse, and the interactions of these various prescription drugs and the harm caused by the effects of such combinations.

Dr. Krantz will testify about rehabilitation programs and the various procedures used to treat people with substance abuse addiction. In addition, Dr. Krantz will testify as to the effects of withdrawal sickness from severe addiction to these prescription drugs, the symptoms experienced from withdrawal sickness, and the physical and psychological harm caused by effects of such withdrawal sickness, to include the anticipation of the onset of withdrawal sickness.

Dr. Krantz will also provide expert testimony regarding her review of medical records, if any, of the victims in this case. Dr. Krantz will also conduct an evaluation of some or all of the victims in this case and review investigative reports relating to those victims.

I have attached Dr. Krantz's curriculum vitae for your review. A thorough report issued by Dr. Krantz is shortcoming [sic].

To date, the undersigned counsel has received no report issued by Dr. Krantz.[1]

---

1. Curiously, the Government wrote a separate letter to counsel for Mr. Blake's co-defendant, Tara Jo Moore, stating that, as to her charges, they intend to call one Dr. Gary Reisfield as an expert. See Defendant's Motion To Exclude Expert Testimony And Second Demand For Expert Summaries, PACER Doc. 180, filed by counsel for Defendant Moore on June 24, 2014, with the letter to him attached as an exhibit. The letter to co-counsel is identical to the letter to the undersigned counsel except for the names of the experts (i.e., the Government appears to have cut and pasted Dr. Krantz's name to replace Dr. Reisfield's name in its letter to the undersigned counsel). Counsel for Ms. Moore reports that he has not received any reports from the Government issued by Dr. Reisfield. The undersigned counsel has no present basis for determining whether Dr. Krantz and Dr. Reisfield have different opinions from each other or different bases or reasons for their respective opinions.

The Government's letter of June 25, 2014, fails to meet the disclosure requirements of Local Rule 88.10(n).   That rule requires that, not later than fourteen days after arraignment, the Government must "disclose to the defendant a written summary of the testimony the government reasonably expects to offer at trial under Federal Rules of Evidence 702, 703 or 705. ***This summary must describe the witnesses' opinions, the bases and reasons therefor***, and the witnesses' qualifications." (Emphasis added).   The Government's letter of June 25, 2014, (which was mailed more than 14 days after arraignment) says that Dr. Krantz will "explain her professional understanding" but fails to say what that understanding entails.   The Government's letter fails to set forth or describe a single opinion of Dr. Krantz, much less her bases for any such opinion or her reason for any such opinion.   The Government has failed to provide the Defendant with adequate notice of the opinions of its proposed expert witness(es), much less the bases and reasons therefor. The Defendant objects to the admissibility of the Government's expert(s) on the basis that its notice is untimely and inadequate.   An adequate proffer made by the Government at this late date would fail to provide the Defendant with sufficient  time to seek a countervailing opinion or opinions from his own expert.

Assuming that the Government were finally to make an adequate proffer regarding the proposed expert's opinions, and the bases and reasons therefor, Federal Rule of Evidence 702 has three major requirements: (1) the proffered expert must be qualified to testify competently regarding the matters she intends to address; (2) the methodology by which the expert reached her opinions and conclusions must be sufficiently reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or in determining a fact in issue.   Because Federal Rule of Evidence 104(a) requires trial courts to make preliminary determinations "concerning the qualification of a

5

person to be a witness, [and] ... the admissibility of evidence," a District Court, when faced with a proffer of expert testimony, must make a preliminary determination as to all of these elements of Rule 702. Moreover, Rule 403 requires the exclusion of otherwise admissible expert opinions if their probative value is outweighed by its potential to mislead, confuse or otherwise improperly influence the jury. See *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. en banc 2004). Probative value, of course, depends upon the nature of the dispute.

**Regarding Counts Four, Five And Six, The Government Has To Prove That There Was A Present, Immediate And Impending Threat Of Serious Harm Sufficiently Serious To Compel A Reasonable Person Of The Same Background And Circumstances As The Alleged Victims To Engage In Prostitution Against Their Will And That They Had No Reasonable Alternative To Working For The Defendants As Prostitutes In Order To Avoid Incurring The Harm**

*Employing* women to engage in prostitution carries a maximum of 10 years incarceration. 18 U.S.C. §2421. *Forcing* women to engage in prostitution against their will through *coercion* carries a minimum of 15 years and a maximum of life incarceration. 18 U.S.C. §1591. The latter, with which the Defendants are charged, is thus exponentially more serious than the former. What separates the ordinary employer/employee relationship from a master/slave or involuntary servitude relationship is the existence of an employment agreement terminable by the employee. See *International Union v. Wisconsin Employment Relations Board*, 336 U.S. 245, 251 (1949). 18 U.S.C. Chapter 77 contains criminal statutes regarding peonage, slavery and involuntary servitude, including 18 U.S.C. §1591. "Involuntary servitude" under federal law means a condition of servitude in which a worker is forced to work for an employer against her will through the use of coercion by the employer. See *United States v. Kozminski*, 487 U.S. 931 (1988). In *Kozminski*, the Supreme Court noted that "in every case in which this Court has found a condition of involuntary

6

servitude, the victim had no available choice but to work" for the Defendant. Id. at 943.  The mere fact that not working would have adverse consequences for the worker is insufficient to qualify the employment as involuntary servitude.  *Watson v. Graves*, 909 F.2d 1549, 1552 (5ᵗʰ Cir. 1990) ("When the employee has a choice [not to work], even though it is a painful one, there is no involuntary servitude.").  For example, in *Greenberg v. Zingale*, 138 Fed.Appx. 197 (11ᵗʰ Cir. 2005) (unpublished), the Court of Appeals observed that, "[a]lthough Floridians who are required to pay alimony must do so or face consequences, such as being held in contempt of court, the district court [Ryskamp, J.] correctly concluded that this does not amount to involuntary servitude."

18 U.S.C. §1591(c)(2) defines the term "coercion" using the operant language incorporated into 18 U.S.C. § 1589, the forced labor statute, which was enacted and made part of Chapter 77 at the same time as section 1591. The terms "coercion and duress," "coercion" and "duress" are, for purposes of the law at issue, interchangeable.  It is instructive to compare 18 U.S.C. §1591(a), which encompasses "force, fraud or coercion," with 18 U.S.C. § 2261, which encompasses "force, coercion, duress or fraud."  Although the language of section 2261 seems broader than section 1591 because it uses the terms "coercion" and "duress" as opposed to only using the term "coercion," it is a distinction without a difference because the terms "coercion" and "duress" are treated under the law as two ways of saying the same thing.  See *United States v. Helem*, 186 F.3d 449, 456-57 (4ᵗʰ Cir. 1999) (approving a jury instruction that the terms coercion and duress are interchangeable); *United States v. Dowd*, 417 F.3d 1080,1086-87 (9ᵗʰ Cir. 2005) (same).  As stated by the Fourth Circuit Court of Appeals in *Helem*, "[t]he words 'force, coercion or duress' necessarily require that the victim is a non-consenting participant."  186 F.3d at 456.  In the case at bar, regarding Counts 4, 5 and 6, the Government has to prove beyond a reasonable doubt that the women at issue were

7

forced against their wills to engage in prostitution by the Defendants because they had well-grounded fears of serious harm at the hands of the Defendants that overwhelmed their opposition to engaging in prostitution and they had no reasonable alternative to doing so.

Coercion and duress regarding the commission of an offense may be used defensively as a shield by one accused of an offense or affirmatively as a sword by the prosecution when it is an element of an offense.  It is instructive to proper analysis of the issues presented in the case at bar to hypothesize that the women at issue were prosecuted for prostitution in violation of Fla.Stat. § 796.07 and claimed coercion or duress as a defense.  Eleventh Circuit Pattern Special Instruction 16, Duress and Coercion, would set forth the law as follows (as modified to parallel 18 U.S.C. § 1591):

> The Defendant claims that if she committed the acts [of prostitution] charged in the indictment, she did so only because she was forced to commit the crime.  If you conclude that the Government has proved beyond a reasonable doubt that the Defendant committed the crime as charged, you must consider whether the Defendant should nevertheless be found 'not guilty' because her actions were [against her will and only performed due to] duress or coercion.
>
> To [establish duress or coercion], the Defendant must prove by a preponderance of the evidence:
>
> First:   That there was an unlawful and present, immediate, and impending threat of [serious harm, meaning any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm];
>
> Second: That the Defendant's own negligent or reckless conduct did not create a situation where the Defendant would be forced to engage in a crime;

8

> Third:  That the Defendant had no reasonable legal alternative
> to violating the law; and
>
> Fourth:  That avoiding the threatened [serious] harm caused
> the . . . action.

As the Court is well aware, in order to have the defense of coercion or duress submitted to a jury, a Defendant must first produce evidence sufficient to prove all of those essential elements. See *United States v. Wattleton*, 296 F.3d 1184, 1196 n. 20 (11th Cir. 2002); *United States v. Montgomery*, 772 F.2d 733, 736 (11th Cir. 1985). Most critically, it must be established as a *prima facia* matter that there was no "reasonable" alternative to engaging in the allegedly forced action in order for the trier of fact to consider a claim of coercion or duress. See *United States v. Sixty Acres In Etowah County*, 930 F.2d 857 (11th Cir. 1991) (Circumstances amount to duress only if the coercive party threatens immediate harm which the coerced party cannot reasonably escape). For example, in *United States v. Alicea*, 837 F.2d 103 (2d Cir. 1988), the Court of Appeals upheld the granting of a motion *in limine* by the Government denying jury consideration of the defense of coercion and duress to female defendants forced to transport drugs after having been raped by their captors, told they were under constant surveillance during a nine-hour plane flight, and threatened with the deaths of their families if they failed to cooperate, because they could have "complain[ed] to the cabin attendants" during the flight or sought assistance from Immigration and Customs officers after landing. The women in the case at bar were free to quit working for the Defendants as prostitutes at any time, albeit with the consequence of having to find an alternative source of drugs or to return to a drug program, and indeed they each did so. If the women in the case at bar were prosecuted for prostitution, it is abundantly clear that the Court would not submit the claim of coercion or duress to the jury because nothing in the record would substantiate a determination that they engaged in

9

prostitution against their wills and only out of a well grounded fear of serious harm at the hands of Mr. Blake that they were powerless to avoid.

**Federal Rule Of Evidence 702 Permits A Witness To Testify As An Expert Only Where the Court Determines That "Specialized Knowledge Will Assist The Trier Of Fact To Understand The Evidence Or To Determine A Fact In Issue"**

In the event of the hypothetical prosecution of the women at issue for prostitution, the Court would not permit expert testimony about their condition in support of a defense of duress or coercion. The Fifth Circuit Court of Appeals in *United States v. Willis*, 38 F.3d 170 (5th Cir. 1994), addressed in thoughtful detail the Defendant's argument that the District Court erred in excluding expert testimony concerning the battered women's syndrome in connection with her defense of coercion and duress. The Court emphasized that (just as with the definition of serious harm in 18 U.S.C. § 1591(e)(4)) the question of coercion or duress is determined under an objective formulation of what a reasonable person would have done under the circumstances. The Court ruled that expert testimony was properly excluded because of the objective standards of determining coercion:

> Evidence that the defendant is suffering from the battered woman's syndrome is inherently subjective . . . Such evidence is not addressed to whether a person of reasonable firmness would have succumbed to the level of coercion present in a given set of circumstances. Quite the contrary, such evidence is usually consulted to explain why this particular defendant succumbed when a reasonable person without a background of being battered might not have. Specifically, battered woman's syndrome evidence seeks to establish that, because of her psychological condition, the defendant is unusually susceptible to the coercion.

> * * *

> [W]e hold that such evidence is not relevant. This is because in order for a duress defense to . . . succeed, the coercive force of the threat must be sufficient such that a person of *ordinary* firmness would succumb. Additionally, there must be no *reasonable* alternative to violating the law. These requirements set out an objective test. To

10

> consider battered woman's syndrome evidence in applying that test, however, would be to turn the objective inquiry that duress has always required into a subjective one.

38 F.3d 170, 175-76 (internal citations omitted, emphasis in original).  For the reasons articulated in *Willis*, the Court would not permit the women to call the expert witness(es) the Government has identified in the case at bar to testify regarding their condition in support of a defense of coercion and duress if they were tried for committing prostitution.  Those reasons apply with equal force when it is the Government making the claim.

The considerations for the admissibility of expert testimony were set forth with great detail by the Eleventh Circuit Court of Appeals, sitting en banc, in *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).  In deciding whether to admit expert evidence under Federal Rule of Evidence 702, the Court

> must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert [v. Merrell Dow*, 509 U.S. 579 (1993)]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  While there is inevitably some overlap among the basic requirements – qualification, reliability and helpfulness – they remain distinct concepts and the courts must take care not to conflate them.

Id. at 1260 (internal citations omitted).  The burden is on the proponent – in this case, the Government – as to each factor.  Id.

"*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury.  As a gatekeeper the court must do 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid

11

and of whether that reasoning or methodology properly can be applied to the facts in issue.'"
*McClain v. Metabolife Intern, Inc.*, 401 F.3d 1233, 1237 (11ᵗʰ Cir. 2005) (citing *Daubert*).  The
Court cannot perform that task in a vacuum where, as in the case at bar, the proponent has failed to
proffer the expert's opinions.  Likewise, the Court cannot determine relevancy without a proffer.
For the reasons articulated by the Court in *United States v. Willis*, supra, it is doubtful that any
proffer from the Government would be sufficient to establish admissibility.

> **The Proposed Expert Testimony Will Not Assist The Jury In Understanding
> What The Witnesses Are Saying; The Manifest Purpose Will Be To Try To
> Persuade The Jury To Sympathize With Them And Thus Confuse The Issues**

It is anticipated that the women will testify that they are drug addicts.  It is anticipated that
each woman will testify about her experiences in rehabilitation programs.  It is anticipated that they
will describe the drugs they ingested and their effects.  It is anticipated that each woman will testify
that her addiction was so severe that she would suffer from withdrawal sickness if she did not
routinely ingest drugs.  It is anticipated that each woman will describe experiencing first hand a
combination of painful physical and psychological symptoms associated with withdrawal, including
such things as seizures, fever, chills, cramping, vomiting and diarrhea.   It is anticipated that each
will testify that she dreaded the prospect of repeating the experience.  Their testimony about such
matters will be uncontroverted.

Matters of common sense typically do not require or allow for expert testimony.  See, e.g.,
*Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11ᵗʰ Cir. 1993) (District Court properly
excluded expert testimony that uneven and poorly lit steps could have contributed to plaintiff's fall
because the potential effect of those factors was readily comprehensible for jurors without the aid
of expert testimony).  In this day and age, ordinary jurors will understand that to be a drug addict

means to be addicted and that withdrawal from drugs for a drug addict, as described by the fact witnesses, is a physically and psychologically difficult ordeal.  They do not need the help of an expert to explain it to them.   "[E]xpert testimony cannot be used solely to bolster the credibility of the government's fact witnesses by mirroring their version of events."  *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir. 1992).  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Frazier*, supra, 387 F.3d at 1262-63.

The probative value of the proposed expert testimony in this case is, absent a proffer from the Government to the contrary, minuscule at best.  On the other hand, such testimony risks confusing the jury about the real issue in this case: whether the women at issue were forced against their wills to engage in prostitution.  The Government, beyond not proffering what the expert(s) will opine, has not proffered that the women in question will testify that they were strongly opposed to engaging in prostitution and that they did so against their will because they had no alternative. Indeed, it is anticipated that the women will testify that they were free to quit at any time, albeit with the consequence of no longer being able to obtain drugs from the Defendants, and did so.  As the Court of Appeals cautioned in *Frazier*, supra, 387 F.3d at 1263,

> Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded under Rule 403.  Exclusion under Rule 403 is appropriate if the probative value of the otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, or if the expert testimony is cumulative or needlessly time consuming.  Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

## Conclusion

The Court should preclude the Government from calling its proposed expert witness(es) for two reasons.  First of all, the Government has failed to comply with the disclosure requirements of Local Rule 88.10(n) because, separate and apart from the fact that its purported disclosure was made more than 14 days after arraignment, it was inadequate because it failed to describe the witness' opinions and the bases and reasons therefore.  It has been three months since arraignment and yet, as of this date, the Government has still not provided meaningful disclosure.  Secondly, the Government has not established that the expert testimony would assist the trier of fact in understanding the evidence or in determining a fact in issue, as opposed to improperly bolstering the credibility of the Government's fact witnesses by mirroring their version of events, nor has it established that the probative value would not be outweighed by the potential to confuse or mislead the jury about critical issues.

Respectfully submitted,
MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

 s/Neison M. Marks
Neison M. Marks
Assistant Federal Public Defender
Court Assigned No. A5500635
450 South Australian Avenue
Suite 500
West Palm Beach, Florida 33401
Phone:   561-833-6288
Fax:      561-833-0368
Neison_Marks@fd.org

14

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY certify that on September 12, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>*s/Neison M. Marks*</u>
Neison M. Marks

15

**SERVICE LIST**
**UNITED STATES OF AMERICA  v.  DONTAVIOUS BLAKE**
**Case No.   13-80054-Cr-Marra**


Neison M. Marks                              Lothrop Morris
neison_marks@fd.org                          Lothrop.morris@usdoj.gov
Assistant Federal Public Defender            Assistant United States Attorney
450 S Australian Avenue                      500 S Australian Avenue
Suite 500                                    Suite 400
West Palm Beach, Florida 33401               West Palm Beach, Florida 33401
Phone:   561-833-6288                        Phone:   561-820-8711
Fax:       561-833-0368                      Fax:       561-820-8777
Attorney for Defendant                       Attorney for Government


Peter T. Patanzo

Benjamin & Aaronson
1 Financial Plaza
Suite 1615
Fort Lauderdale, FL 33394
954-779-1700
Fax: 779-1771
Email: ppatanzo@bellsouth.net
Attorney for Defendant Tara Moore

16