# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 13-80054-CR-MARRA

**UNITED STATES OF AMERICA,**

**vs.**

**DONTAVIOUS M. BLAKE ,**
**a/k/a "D", and**
**TARA JO MOORE,**

**Defendants.**
_____/

### GOVERNMENT'S RESPONSE TO BLAKE'S
### AMENDED SENTENCING MEMORANDUM

The United States of America, by and through the undersigned Assistant United States Attorney, hereby files this Sentencing Memorandum,[1] and states as follows:

## I.     BACKGROUND

The guidelines limit the permissible grounds for downward departures in cases of sexual abuse of children, specifically disallowing departures based on diminished

---

[1] The Presentence Investigation Report (PSR) was disclosed to Tara Jo Moore on December 16, 2014 and to Dontavious Blake on December 19, 2014.   Moore's objections were due on December 30, 2014 and Blake's on August 2, 2015.   Therefore the objections filed after these dates are untimely, *see* Fed. R. Crim. P. 32(f)(1) (requiring objections to PSR to be filed within fourteen days after receipt of the PSR), and the Court may overrule the objections on that basis.   *See United States v. Edouard*, 485 F.3d 1324, 1351 (11th Cir. 2007); *see also United States v. Smith*, – F. App'x –, 2013 WL 2986902 at *1 (11th Cir. 2013).

capacity (U.S.S.G. § 5K2.13), aberrant behavior (*id*. § 5K2.20), substance abuse (*id*. § 5K2.22), or family responsibilities and community ties (*id*. § 5H1.6). They provide that generally an offender's age and health are not relevant, except in rare cases where the offender is so elderly and infirm that home confinement would be an effective alternative to prison. *Id*. §§ 5H1.1, 5H1.4. The guidelines also provide that charitable contributions and a defendant's mental and emotional condition generally are not appropriate grounds for departure. *Id*. §§ 5H1.11, 5H1.3.

## II.    DISCUSSION

Defendant, Dontavious M. Blake, requests a major [2] variance from the Guideline Sentencing range of Life to 12 ½ years.   Blake asks this Court to reject the guideline sentencing range of life imprisonment and instead impose a sentence of 12 ½ years. Blake has failed to provide a factual basis and has cited no legal authority to support his request for such a major variance in this sex trafficking case.   While the guidelines are advisory, they are entitled to great deference especially in cases involving sex crimes against children.

---

2 In *United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010), the Eleventh Circuit found that a 12 ½ year variance from the 30 year maximum sentence was substantively unreasonable.   The *Irey* court explained that [w]hether considered in absolute or percentage terms, it is a "major" variance in the legal parlance of sentencing law. *See United States v. Smith*, 573 F.3d 639, 660–61 & n. 5 (8th Cir.2009) (requested variance downward from a 360–month guidelines sentence to one of 240 months, a reduction of 33 percent, would have been "a major variance"); *United States v. Abu Ali*, 528 F.3d 210, 261 (4th Cir.2008) (noting that a downward variance of 40 percent to a sentence of 30 years is "major"); *see also United States v. Burns*, 577 F.3d 887, 888–90, 896 (8th Cir.2009) (a variance downward by 60 percent from a 360–month guidelines sentence to one of 144 months imprisonment is "beyond dispute" a major one).

A.    *The Defendants Objections To The Guideline Offense Level Computation*

1.    **Base Offense Level § 2G1.3**

The Defendant does not dispute that his base offense level, pursuant to § 2G1.3, is 30 because the offense involved sex trafficking of a minor in violation of 18 U.S.C. § 1591(b)(2).

2.    **The Minors Were in the Defendants' Care, Custody & Control § 2G1.3(b)(1)(B)**

Blake claims that he did not exercise care, custody and control over T.H. or E.P. Blake ignores *United States v. Jennings*, 280 Fed.Appx. 836, 2008 WL 2247142 (11th Cir. 2008) and instead cites to *United States v. Brooks*, 610 F.3d 1186 (9th Cir. 2010) to support his position.   In *Jennings*, the Eleventh Circuit took a much more expansive approach and held that the guideline and commentary language do not exclude a minor's entrustment of herself to a defendant. *See* U.S.S.G. § 2G1. 3( b)( 1)( B), comment. (n.2(A)). The commentary states the provision is to have broad application, and it precedes "temporary caretakers" with the qualifier "other"—not "other similar"—cutting against defendant's argument that "other temporary caretakers" was limited by the terms preceding it. *See id*. The court found that the evidence was sufficient to demonstrate the defendant directly oversaw the minor and slept in the motel room with her, and, as aiders and abettors of the prostitution venture, were partially responsible for the minor's custody and supervisory control. The Eleventh Circuit held that the district court did not

3

err in applying the two-level enhancement pursuant to § 2G1.3(b)(1)(B). The undisputed facts presented at trial support the application of this enhancement.

At trial, T.H. testified that Blake spent a great deal of time with her and would stay in hotel rooms with her.   T.H. testified as follows:

Q    Now, how often during this period of time would you say you were physically around Mr. Blake when you were prostituting?   Like how often would you see him?

A    After pretty much every call.

Q    And when you -- when he would come to pick you up, you would get in the car with him?

A    If we were switching hotels or if I was leaving, yes, but sometimes he would come up to the room.

*See* DE 297:81

T.H. testified that she saw Blake and Moore with E.P when she was prostituting. T.H. explained the interactions as follows:

Q    Did you ever see EP with Mr. Blake together while she was prostituting for Mr. Blake?

A    Yes.

Q    Did you ever see EP together with Ms. Moore while she was prostituting?

A    Yes.

Q    How often would you say you saw them together?

A    I think I only saw Tara and [E.P.] together, I can count it on one hand.

4

Q       How about Mr. Blake?

A       Every time that me and [E.P.] were at the hotel, he was there pretty much.

*See* DE 297:82

T.H. also testified that Blake and Moore would post the advertisements for prostitution.   T.H. testified as follows:

Q       So who would post the ad?

A       D and Tara.

*See* DE 297:27

Blake exercised a great deal of control over the minors finances, living arrangements and activities while they worked as prostitutes for him.

### 3.      The Defendant Unduly Influenced the Minors to Engage in Prohibited Sexual Conduct § 2G1.3(b)(2)(B)

Defendant objects to the two-level enhancement for unduly influencing a minor to engage in prohibited sexual conduct pursuant to U.S.S.G. §2G1.3(b)(2). The Guidelines provide a two level sentence enhancement if "a participant ... unduly influenced a minor to engage in prohibited sexual conduct." U.S.S.G. § 2G1. 3(b)(2)(B). U.S.S.G. § 2G1.3, comment. (n.3(B)). Application Note 3(B) further provides that, where a participant is at least ten years older than the minor, there is a rebuttable presumption of undue influence. Id. "In such a case, some degree of undue influence can be presumed

because of the substantial difference in age between the participant and the minor." Id.

Blake was fourteen years older than T.H. and thirteen years older than E.P. In *United States v U.S. v. Harrison*, ---Fed.Appx. ----, 2013 WL 4529184 (C.A.11 (Fla.)), the Eleventh Circuit affirmed a district court's application of the undue influence enhancement. *See United States v. Jerchower*, 631 F.3d 1181, 1186 n. 2 (11th Cir.2011). The Court applied the rebuttable presumption of undue influence because the participant was at least ten years older than the victim. *See* U.S.S.G. § 2G1.3, comment. (n.3(B)). The Court found that Harrison failed to rebut the presumption of undue influence for several reasons including that he had superior resources and that he used those resources to unduly influence the minor. Blake also possessed superior resources including cash, narcotics, a car, and a house. He used cash and narcotics to unduly influence the minors to engage in prostitution

In *United States v. Jones*, 546 F.Appx 946 (11th Cir. 2013), the Court found that the defendant "exercised undue influence over the girls by purchasing hair products, jewelry, and makeup for them, and he convinced the fifteen-year-old girl he loved her. He also took their money, controlled how much they could charge for their services, and controlled the cellular phone they used to schedule prostitution dates."

T.H. testified at trial that Blake was engaging in sexual activity with E.P. when she was 16 years old.   T.H. testified as follows:

Q    Well, let's talk -- let's start from before that.   How did you get introduced to D?

A    A friend of mine at the time, [E.P], introduced me to him.

Q    And who is [E.P.]?

A    She was a very close friend of mine years ago.  I met her when I was 11, and we had -- we were best friends for years.

Q    How old was [E.P.] at the time?

A    When I first met her?

Q    No, at the time that you first met D.

A    Sixteen.

Q    And what was she doing?  What was her relationship with D?

A    Her and D, she worked for him like I did, and she was also intimate with him.

*See* DE 297:21

T.H. also testified at trial that E.P. was still prostituting for Blake and Moore a year later in August of 2012 when she was a minor.   T.H. testified as follows:

Q    At that time [when Frank Smith was arrested] do you know what [E.P.'s] relationship was with D?

A    At that time she was still working for him.

*See* DE 297:32

T.H. testified that she had been sexually and physically abused as a child.   She testified that the abuse had a tremendously destabilizing effect on her life.   T.H. testified

as follows:

Q    You mentioned that you were sexually abused.   Can you just tell the jury what happened?

A    From the age of five 'til eight, my grandfather's brother sexually abused me.

Q    Did you tell anybody?

A    No.     This is the first time I've actually said it to a whole room of people.

Q    And as a result of that, how did that affect, you know, your growing up?

A    I grew up very -- not stable, very unstable, very hurt, very angry. My moral system wasn't correct.

                    *       *       *       *       *       *

Q    And you -- did you have any money, any source of income at that time?

A    No.

Q    And how would you characterize, again, your family  relationships?   Were  they stable?

A    No.

Q    Where were you living at that time?

A    At that time I was living at my father's house.

Q    At any point did you run away?

A    Yes.

*See* DE 297:37-40

        E.P. testified at trial that she introduced T.H. to Blake because she was on the run

8

from the Kelly Center for Behavioral Health (a drug treatment center).   E.P testified as

follows:

Q.    Did you ever -- do you recall introducing [T.H.] -- or introducing [T.H.] to
      Dontavious Blake?

A.    Yes, I did.

Q.    And do you recall how you -- what occurred on that occasion?

A.    She was on a run, from the Kelly Center or whatnot, and she was already doing
      stuff or whatever, you know.  She was living from, like, house to house and
      whatnot, you know.

*See* DE 298:136-37

       E.P. testified that she had also just been released from a behavioral program when

she was sixteen.   She testified as follows:

Q.    Do you recall how old you were when you got that?

A.    I just got out of my program, so I'm going to say, like, sixteen, seventeen.
      that?

*See* DE 298:145-46

       At trial T.H. testified that Blake and Moore supplied her with drugs and

cigarettes.   T.H. testified as follows:

Q     Would -- who purchased your cigarettes for you?

A     When I was with them?

Q     Yes.

9

A     They did.

Q     Why is that?

A     Because I wasn't 18.   I didn't have an ID.

Q     What type of cigarettes would she purchase for you?

A     She would always get Newport 100s, because that's what she smoked.   I smoked shorts.

Q     And how did you feel about that?

A     Irritated me a little bit.

Q     Have you ever smoked marijuana with Ms. Moore?

A     Yes.

Q     Have you ever taken drugs with Ms. Moore?

A     Me and her never really did the same type of drugs.    I've seen her on drugs.

Q     Okay.

A     She's seen me on drugs, but . . .

Q     Did she ever bring you drugs?

A     Yes.

Q     What drugs did she bring you?

A     Cocaine.

Q     I'm sorry, I didn't hear that.

A     Cocaine.

Q     Do you remember how much?

A     Probably like three bags.

Q     How much is that?

A     Like $60 worth.

*See* DE 297:44-45

Blake was involved in a sexual relationship with E.P while she was working as a prostitute for him.   He used undue influence on vulnerable minors who he recruited from behavioral programs.   He had vastly superior resources because both minors had no income.   T.H. was a runaway girl who was homeless and who had been sexually and physically abused.

### 4.     The Defendant's Use of a Computer § 2G1.3(b)(3)(B)

Defendant concedes that the commentary to the guideline sentencing enhancement § 2G1.3(b)(3) is erroneous and that his offense level should be enhanced by two levels because he used a computer.

### 5.     The Offense Involved a Commercial Sex Act § 2G1.3(b)(4)(B)

Blake claims that the application of the § 2G1.3(b)(4)(B) enhancement is inappropriate double counting.   Blake, following Appendix C of the guideline sentencing commission manual, claims that the commission of a sex act or sexual contact

11

is a required element of the offense of 18 U.S.C. § 1591.   It is not.

Blake cites Amendment 701 to § 2G1.3 for support.   The sentencing commission explained that § 2G1.3(b)(4) provides for a 2-level enhancement if the offense involved the commission of a sex act or sexual contact, or if the offense involved a commercial sex act and the defendant was either: (1) convicted under 18 U.S.C. §§ 2422(b) or 2423(a); or (2) convicted of any offense covered by §2G1.3 other than 18 U.S.C. § 1591. **Offenses committed under 18 U.S.C. § 1591 are not included in this specific offense characteristic because they necessarily involve a commercial sex act**. *See United States v. Watkins*, 667 F.3d 254 (2d Cir. 2012) (holding that the enhancement is not double counting because the statute prohibits travel with intent to engage in sexual activity and therefore one may violate the statute without actually having committed a sexual act). *See* USSG Sex Offense Primer: 2014 at p. 20.

The Amendment to the Guidelines is incorrect.   The Eleventh Circuit recently held that 18 U.S.C § 1591 does not necessarily involve a commercial sex act.   In *United States v. Mozie*, -- F.3d --, 2014WL2118745 (11th Cir. 2014), the defendant challenged his convictions on Counts 6 , 7, and 8, arguing that there was insufficient evidence that the victims in those counts actually engaged in commercial sex acts.   *Id*. at p. 11.   The legal premise of Mozie's challenge was that the statute (§ 1591) required that the minor must have engaged in a commercial sex act.   *See id*.   The *Mozie* Court held that it did not. *Id*.

12

The Court explained that it was enough that Mozie "recruited" the victims in Counts 6 through 8 to engage in commercial sex acts even though they did not actually do so. *Id*. In *Mozie* the minors in Counts 6 through 8 did not engage in a commercial sex act. *Id*. Accordingly, the Eleventh Circuit held that § 1591 does not necessarily involve a commercial sex act.   In *United States v. Watkins*, 667 F.3d 254 (2d Cir. 2012), just as in *Mozie*, one may violate the statute without actually having committed a sexual act.   In *Watkins* the statute (18 U.S.C. § 2324(a)) prohibited travel with intent to engage in sexual activity which does not require a sex act.

This Court's jury instructions clearly do not require the commission of a sex act or sexual contact.

The Court instructed the jury that the defendant could be found guilty if:

( 1)    the Defendant knowingly recruited, enticed, harbored, transported. provided, obtained or maintained by any means a person;

(2)    that the Defendant did so knowing or in reckless disregard of the fact that the person had not attained   the age of 18 years and would   be caused   to engage   in a commercial sex act ; and

(3)    that the Defendant's acts were in or affected interstate or foreign commerce.

*See* DE 274

In this case, as in *Mozie*, the statute ( 18 U.S.C. § 1591) prohibits recruiting, enticing, harboring, or transporting, obtaining, or maintaining a person who would be

caused to engage in a commercial sex act.   Thus, the act of recruiting and transporting, etc. a person with the intent that that person would be caused to engage in a commercial sex act does not require a sex act.

There is no impermissible double-counting. Therefore, given that Blake recruited and transported a minor in violation of 18 U.S.C. § 1591, and the undisputed evidence that he committed a sex act with E.P., a minor, the application of the § 2G1.3(b)(4)(A) enhancement is appropriate. The enhancement punishes Blake for committing a sex act, on E.P. which would not otherwise be reflected in his base offense level of 30.

### 6.   The Defendants Were Organizers or Leaders of a Criminal Activity § 3B1.1(a)

Under § 3B1.1 of the Sentencing Guidelines, this Court may enhance a defendant's sentence by two to four points depending upon the nature of the defendant's role in the criminal activity and the number of participants involved. U.S.S.G. § 3B1.1(a)-(c).

Here, the PSR included a four-level role enhancement because the defendants were organizers and leaders of a criminal activity that involved five or more participants or was otherwise extensive.

#### i.   Five or More Participants

The criminal activity involved five or more participants and was otherwise extensive.   The five participants include Blake, Moore, Frank Smith, the photographer who took pictures of T.H. for advertisements, Heaven Leigh Siegel, Khrystyna Trejo, E.P.

Britany LNU, three prostitutes working for Blake and Moore, Bug, and Cassandra Fisher.   The organization was extensive.

At trial, T.H. testified that there were at least three or four girls working for Blake and Moore.   T.H. testified as follows:

Q      And while you were working for D and Tara, were there any other girls that were working for them?

A      Yes.

Q      About how many?

A      At the time, it was three or four other girls.

*See* DE   297:35

T.H. testified that Blake and Moore hired a photographer to take photographs of her for the Backpage ads.   T.H. testified as follows:

Q      Now, when you started working with Mr. Blake and Ms. Moore, did they ever hire a professional photographer?

A      Yes.

Q      And do you recall what was going on with that? I mean, why?

A      They said it was for pictures for ads.

*See* DE 297:41

E.P. testified that she was a participant in the conspiracy.   She testified as follows:

15

Q.      Did you send a text message of the -- the – did you send a text -- a text message regarding that arrest, of Frank Smith, to Dontavious Blake?

A.      Yeah, I did.   We talked about it.

Q.      Why did you -- why did you do that?

A.      Because, I mean it had something to do with [T.H.].   You know, [T.H.] has been with us, knew what we were doing.   So, I mean, I felt like it was only right, to let him know what was up.   Because I didn't want to get in trouble myself.   You know, she could have messed up me, in the process.

Q.      You were actually trying to protect him.

A.      I mean, protect him but also protect myself because I'm doing it with him. You understand what I'm saying?   I'm -- I'm also the one, you know, doing, like -- committing a crime.   I'm in the one in the hotel room, you know.   So I mean I'm also doing it.   So, if they're going to look at him, they're going to be looking at me, also.

*See* DE 298:142-43

### ii.      Organizer Leader

Both Blake and Moore engaged in "decision-making authority" during the offense. The unrebutted facts adduced at trial demonstrate that both Blake and Moore engaged in the following organizer and leadership activities: (1) Blake and Moore orchestrated the plan to cause T.H. and E.P. to commit commercial sex acts; (2) Blake and Moore photographed the minors used to create the ads to advertise the girls online for commercial sex; and (3) Blake and Moore played a role in creating the ads and transporting the minors. Each of these actions resulted from Blake and Moore's plan to

cause the minors to engage in prostitution.

E.P. testified that Blake and Moore would make the hotel reservations.   She

testified as follows:

A.      I mean I saw D do it [make the reservations] a couple of times.   You know, 'cause usually, like, they would already have the room.

*See* DE 298:140

T.H. testified that Blake and Moore would drive her to prostitution dates.   She

testified that Moore would negotiate the prices and schedule the prostitution dates.

T.H. testified as follows:

Q       Okay.   And who was it that brought you to the hotel on those instances?

A       D or Tara.

Q       So Tara also brought you to the hotel sometimes?

A       She mostly just waited in the car.   She didn't really drive.

Q       What did Tara do with relation to the prostitution calls?

A       She would answer the phone and act like she was us so that -- and tell them how much and where we were and . . .

*See* DE 297: 26-27

On re-cross examination, E.P. described the services that Blake provided to

prostitute her.   She testified that:

Q.      When did you prostitute for Mr. Blake?

17

A.     I haven't prostituted for Mr. Blake.   I prostituted for myself, to get money for me.

Q.     Well, I understand.  But you paid money to him, right?

A.     Yes, because -- I mean, I couldn't do it without him, so he would, you know -- basically, paid the money for gas, for driving me places, picking me up, posting me up. You need a – you need a credit card to do that, and other stuff.   So I mean he paid -- he paid money, too, so I had to give him back the money.

Q.     Did you know how to post yourself on backpage, when you first started?

A.     No.     Like I said, I never even did any of my ads myself.

*See* DE 298:168

Ms. Siegel testified that she witnessed E.P prostitute for Blake and Moore while she was a minor and that she comforted E.P. because it was her first time.   Siegel testified as follows:

Q     Let's -- let me say it again.  Did you ever see EP, [  ], did you ever see her actually engage in prostitution?

A     Yes.

Q     Okay.   Can you just describe that to the jury?

A     I witnessed her.   She was nervous, because it was her first time.   She was asking me how I felt my first time.   I guess she wanted to have -- feel like I related to her in some way so she can feel more comfortable about it.

*See* DE 296:176

**7.     Pattern of Activity Involving Prohibited Sexual
        Activity § 4B1.5(b)(1)**

Blake claims that because his offense level was correctly enhanced two levels

18

under § 3D1.4 he should not receive another five level upward adjustment for engaging in a Pattern of Prohibited Sexual Activity pursuant to § 4B1.5(b)(1).   Blake refers to this as redundant rather than using the term double-counting, in an effort to ignore the express wording of § 4B1.5(b)(1).   Section 4B1.5(b)(1) specifically states that the enhancement is to be added to the offense levels determined under Chapters Two and Three.   Thus, the guidelines intend the cumulative application of most enhancements in conjunction with §4B1.5. *See United States v. Rothenberg*, 610 F.3d 621 (11th Cir. 2010) (holding application of the 5-level enhancement under §2G2.2(b)(5) and the 5-level enhancement under §4B1.5(b)(1) was appropriate where the defendant had two different online conversations with other adults in which he coached the adults on how to sexually abuse minors); *United States v. Fadl*, 498 F.3d 862 (8th Cir. 2007) (holding that the district court's application of both §2G2.1(d)(1) and §4B1.5(b) did not constitute impermissible double-counting because "[t]he application of § 2G2.1(d)(1) punished [the defendant] 'for exploiting[ ] different minors, while the § 4B1.5(b) enhancement punished him for exploiting those minors on multiple occasions'") (citation omitted); *United States v. Schmeilski*, 408 F.3d 917 (7th Cir. 2005) (same); *United States v. Peck*, 496 F.3d 885 (8th Cir. 2007) (same); *see also United States v. Von Loh*, 417 F.3d 710 (7th Cir. 2005) (finding no impermissible double-counting where the district court did not group the counts and imposed enhancements under §3D1.4 and §4B1.5).

19

B. *Blake and Moore Should Receive a Sentence Within The Guideline Sentencing Range*

1. **A Reasonable Sentence Is a Sentence Within The Advisory Guideline Sentencing Range**

Blake claims that part of the determination of a reasonable sentence is consideration of a need to avoid unwarranted disparity in sentences imposed for offenders who have engaged in significantly similar offense conduct.   In ¶ 3 of the PSR, the related case of Frank Smith, Case No.: 12-80151-Cr.-Middlebrooks lists the sentence of 240 months imprisonment for his role in this sex trafficking ring.   Frank Smith was a client of Blake and Moore.   Blake and Moore knew that Frank Smith was a pedophile when they sold T.H. to him for sex.   Blake requests a 12 ½ year term of imprisonment for his criminal conduct in this case.   Such a sentence would result in the unwarranted disparity in sentences because Smith is clearly less culpable than Blake.   *See United States v. Gall*, 552 U.S. 38 (2007).

The *Mozie* Court held that "the punishment should fit the crime, [and] the more serious the criminal conduct is the greater the need for retribution and the longer the sentence should be." *Irey*, 612 F.3d at 1206.   The Court concluded that "[c]hild sex crimes are among the most egregious and despicable of societal and criminal offenses." *United States v. Sarras*, 575 F.3d 1191, 1220 (11th Cir.2009). For that reason, the Eleventh Circuit has repeatedly upheld "severe sentences in these cases." *United States v. Pugh*, 515

F.3d 1179, 1202 (11th Cir.2008);  *see also United States v. Williams*, 564 Fed.App'x. 568

((11th Cir. 2014)( defendant was sentenced on January 8, 2013 to a term of life

imprisonment for sex trafficking minors)); *United States v. Flanders*, 752 F.3d 1317 ((11th

Cir. 2014)(life sentences for sex trafficking and related offenses were not substantively

unreasonable));  *United States v. Desir*, Case No.: 12-60312-Cr.-Cohn (the Court

sentenced defendant to Life for sex trafficking);  *United States v. Madkins*, 390 Fed.App'x.

849 (11th Cir. 2010)( the district court varied his sentence downward from life to 50 years

imprisonment).

      **WHEREFORE**, the United States of America respectfully files this Response to

Blake's Sentencing Memorandum requesting that he receive a life sentence which is

within the advisory guideline sentencing range.

                                   Respectfully submitted,

                                   WIFREDO A. FERRER
                                   UNITED STATES ATTORNEY

                                    s/LOTHROP MORRIS
                        By: LOTHROP MORRIS
                                   ASSISTANT U.S. ATTORNEY
                                   Florida Bar # 0095044
                                   500 Australian Avenue, Suite 400
                                   West Palm Beach, FL 33401
                                   (561) 820-8711
                                   (561) 820-8777 (FAX)
                                   LOTHROP.MORRIS@USDOJ.GOV

## <u>Certificate of Service</u>

I HEREBY CERTIFY that on February 27, 2015, I electronically filed the foregoing with the Clerk of the Court using CM/ECF.

<div style="margin-left: 40%;">

S/ LOTHROP MORRIS\_\_\_\_\_
LOTHROP MORRIS
ASSISTANT UNITED STATES ATTORNEY

</div>